**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

Case No.  11-34018

ROBERT BENTLEY MARLOW

Debtor

ROBERT BENTLEY MARLOW

Plaintiff

v.

Adv. Proc. No.  11-3221

THE DEPARTMENT OF EDUCATION/
SALLIE MAE; THE UNITED STATES
DEPARTMENT OF EDUCATION;
SALLIE MAE, INC.; SALLIE MAE LSCF;
ZION FNB ELT NATIONAL EDUCATION;
USA FUNDS, INC.; US BANK ELT BHEA;
BONY MELTON ELT EDSOUTH;
EDFINANCIAL; FEDLOAN SERVICING;
THE UNIVERSITY OF TENNESSEE; THE
TENNESSEE STUDENT ASSISTANCE
CORPORATION; and DEPT. OF ED/AES PHEAA

Defendants

EDUCATIONAL CREDIT MANAGEMENT
CORPORATION

Defendant/Intervenor

**MEMORANDUM ON
MOTION FOR SUMMARY JUDGMENT**

**APPEARANCES:**    Robert Bentley Marlow
322 Douglas Avenue
Knoxville, Tennessee  37921-4813
Plaintiff, *Pro se*

CHAMBLISS, BAHNER & STOPHEL, P.C.
  Bruce C. Bailey, Esq.
  Jeffrey W. Maddux, Esq.
  1000 Tallan Building
  Two Union Square
  Chattanooga, Tennessee  37402
  Attorneys for Defendant/Intervenor Educational Credit
  Management Corporation

WILLIAM C. KILLIAN, ESQ.
UNITED STATES ATTORNEY
  Suzanne H. Bauknight, Esq.
  800 Market Street
  Suite 211
  Knoxville, Tennessee  37902
  Attorneys for Defendant United States, on behalf of its agency,
  The United States Department of Education

STONE & HINDS, P.C.
  Steven D. Lipsey, Esq.
  Matthew Todd Ridley, Esq.
  507 South Gay Street
  Suite 700
  Knoxville, Tennessee  37902
  Attorneys for Defendant Sallie Mae, Inc.

THE UNIVERSITY OF TENNESSEE
  Curtis Ryan Stinett, Esq.
  Office of General Counsel
  719 Andy Holt Tower
  Knoxville, Tennessee 37996
  Attorneys for Defendant The University of Tennessee

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

The Plaintiff filed the Complaint to Determine Dischargeability of Student Loan Debt on October 17, 2011, and an Amendment to Complaint to Determine Dischargeability of Student Loan Debt on November 7, 2011, asking the court for a determination that it would impose an undue hardship upon him to repay student loans owed to the Defendants and that he is therefore entitled to a discharge of his student loans pursuant to 11 U.S.C. § 523(a)(8) (2006). Sallie Mae, Inc., Educational Credit Management Corporation (ECMC), as assignee of Tennessee Student Assistance Corp. and USA Funds, Inc., the United States of America, on behalf of its agency, the United States Department of Education (Department of Education), and the University of Tennessee filed responsive pleadings on November 15, 2011, November 16, 2011, March 23, 2012, and March 26, 2012, respectively. The remaining Defendants have been dismissed from the adversary proceeding through separate orders.[1]

Presently before the court is the Motion for Summary Judgment filed by ECMC, the Department of Education, the University of Tennessee, and Sallie Mae, Inc. on August 3, 2012, which was accompanied by a Statement of Undisputed Facts in Support of Joint Motion for Summary Judgment (Statement of Undisputed Facts) and a brief as required by E.D. Tenn. LBR 7056-1,[2] and is supported by: (1) Affidavit of Petra Shipman; (2) Affidavit of Jennifer Vinson; (3) Declaration of Sheryl Davis; (4) Plaintiff/Debtor's Amended Response to Sallie Mae, Inc.'s First

---

[1] American Education Services (Dept. of Ed/AES PHEAA) was dismissed pursuant to an Order entered on December 22, 2011. The Department of Education/Sallie Mae, Sallie Mae LSCF, USA Funds, Inc., EdFinancial, and The Tennessee Student Assistance Corporation were dismissed pursuant to an Order entered on January 6, 2012. Zion FNB ELT National Education, US Bank ELT BHEA, and Bony Melton ELT EdSouth were dismissed pursuant to an Order entered on January 24, 2012. FedLoan Servicing was dismissed pursuant to an Order entered on January 25, 2012.

[2] All of these documents refer to the Defendant Educational Credit Management Corporation as Educational Credit Management Company. Because the court's January 6, 2012 Order allowed Educational Credit Management Corporation to intervene as a party Defendant, the court deems this distinction merely stylistic.

Set of Interrogatories; First Request for Production of Documents, and First Set of Requests for Admissions to which the following documents are attached: (A) Show Cause Order dated June 27, 2011, in *In re Marlow*, No. 10-07, Tennessee Board of Law Examiners; (B) Response to Show Cause Order dated June 14, 2010, in *In re Marlow*, No. 10-07, Tennessee Board of Law Examiners; (C) Order and memorandum dated February 23, 2012, in *In re Marlow*, No. M2011-01789-SC-WR-BL, Supreme Court of Tennessee; (D) Promissory Note dated January 5, 2011, in the amount of $10,500.00 executed by Scott K. Walker; (E) Resume of R. Bentley Marlow, J.D., M.A.; (F) Unofficial Undergraduate Academic Record for Robert Bentley Marlow from Tennessee Technological University; (G) Student Academic History for Robert Bentley Marlow from the University of Tennessee; (H) Transcript for Robert Bentley Marlow from Roane State Community College; (I) Certificate from Universitatbonn dated July 9, 2005; (J) Transcript of Academic Record for Robert Bentley Marlow from Samford University; (K) letter dated June 1, 2009, to Sallie Mae, Inc. requesting deferment; (L) letter dated November 15, 2010, to Sallie Mae, Inc. requesting a forbearance and official Request for Forbearance with facsimile transmission pages; (M) letter dated November 15, 2010, to the University of Tennessee requesting a forbearance and official Request for Forbearance/Hardship/Unemployment Deferment; (N) Account Summary from Edfinancial Services Student Portal; (O) Account Summary from Sallie Mae Manage Your Loans webpage; (P) letter dated February 2, 2011 to the University of Tennessee requesting a forbearance; (Q) emails and letters seeking and concerning applications for employment; and (R) Petition for Writ of Certiorari of *In re Marlow* to the Supreme Court of the United States of America; (5) Plaintiff/Debtor's Fifth Addendum Response to Sallie Mae, Inc.'s First Set of Interrogatories, First Request for Production of Documents, and First Set of Requests for Admissions;

4

(6) Plaintiff/Debtor's Response to United States of America's First Set of Interrogatories Propounded to Debtor/Plaintiff, First Request for Production to Plaintiff, and First Set of Requests for Admissions to Debtor/Plaintiff; (7) Complaint filed April 20, 2011, commencing *Marlow v. City of Knoxville et al.*, No. 3-181-11, in the Circuit Court for Knox County, Tennessee; (8) Complaint filed June 26, 2012, commencing *Marlow v. Tennessee Supreme Court et al.*, No. 3:12-cv-00646, in the United States District Court for the Middle District of Tennessee; (9) Order entered in *Marlow v. Tennessee Supreme Court, et al.*, No. 3:12-cv-00646, in the United States District Court for the Middle District of Tennessee, on July 11, 2012; and (10) City of Knoxville Ordinance Citation No. A 470091 dated February 7, 2012.[3]

The Plaintiff filed the Plaintiff/Debtor's Brief in Opposition to Defendant's [sic] Joint Motion for Summary Judgment (Response to Motion for Summary Judgment) and the Plaintiff/Debtor's Response to Defendant's [sic] Statement of Undisputed Facts and Plaintiff/Debtors [sic] Statement of Additional Undisputed Facts (Response to Statement of Undisputed Facts) on August 24, 2012. He also filed Plaintiff/Debtors [sic] Statement of Additional Undisputed Facts in Opposition to Defendant's [sic] Joint Motion for Summary Judgment (Statement of Additional Undisputed Facts), to which he attached the following in support of his Response: (1) a collection of letters and documentation wherein the Plaintiff sought employment from a number of sources; (2) the Affidavit of Robert Lee Marlow; (3) documentation of the Plaintiff's unsecured debts; (4) a Compliance With Court Requirements – Traffic Violation Failure Withdrawal docket #MC1174975

---

[3] The Defendants referred to the foregoing documents denoted as numbers 4 through 10 by the court as Collective Exhibit 1. In order to provide citations to specific documents and better organize the record, the court will refer to this exhibit as Defendants' Collective Exhibit 1 and will provide citations to the specific pages upon which the individual documents begin or are quoted from.

dated August 10, 2012; (5) Response of the United States to Plaintiff/Debtor's First Set of

Interrogatories, First Request for Production of Documents, and; First Set of Requests for

Admissions; (6) a Memorandum entered on August 17, 2012, in *Marlow v. Tennessee Supreme

Court et al.*, No. 3:12-cv-00646, dismissing all but one 42 U.S.C. § 1983 claim asserted against the

National Conference of Bar Examiners; and (7) an Order entered on August 17, 2012, in *Marlow v.

Tennessee Supreme Court et al.*, No. 3:12-cv-00646, referring the action to the Magistrate Judge for

pre-trial management.[4]  As authorized by E.D. Tenn. LBR 7056-1(c), on September 7, 2012, the

Defendants filed the Response to Plaintiff's Statement of Additional Undisputed Facts in Opposition

to Defendants' Joint Motion for Summary Judgment.[5]  Additionally, pursuant to Rule 56(c)(3) of the

Federal Rules of Civil Procedure, the court has considered non-cited materials in the record and,

pursuant to Rule 201 of the Federal Rules of Evidence, has taken judicial notice of undisputed

material facts and documents of record in the Plaintiff's underlying bankruptcy case.

This is a core proceeding.  28 U.S.C. § 157(b)(2)(I) (2006).

## I

The Plaintiff earned a Bachelor of Arts in Philosophy in December 2001, and completed his

Master of Arts in Social and Political Philosophy in May 2010, both from the University of

---

[4] The Plaintiff referred to the foregoing documents denoted as numbers 1 through 7 by the court as Collective Exhibit 1.  In order to provide citations to specific documents and better organize the record, the court will refer to this exhibit as Plaintiff's Collective Exhibit 1 and will provide citations to the specific pages upon which the individual documents begin or are quoted from.

[5] Additionally, on September 7, 2012, the Defendants filed the Defendants' Joint Reply Brief to Plaintiff's Brief in Opposition to Defendants' Joint Motion for Summary Judgment.  This document, however, was not authorized by Rule 56, the Local Rules for the United States Bankruptcy Court for the Eastern District of Tennessee, or court order and will therefore not be considered in the court's decision on the Motion for Summary Judgment.

6

Tennessee.  Stmt. of Undisp. Facts at ¶ 11; Resp. to Stmt. of Undisp. Facts at ¶ 11.  He also received an Associates of Science in Paralegal Studies degree from Roane State Community College in May 2004.  Stmt. of Undisp. Facts at ¶ 11; Resp. to Stmt. of Undisp. Facts at ¶ 11. Thereafter, in May 2009, the Plaintiff earned a Juris Doctorate from the Cumberland School of Law at Samford University.  Stmt. of Undisp. Facts at ¶¶ 1, 11; Resp. to Stmt. of Undisp. Facts at ¶¶ 1, 11.  While completing each of the foregoing degrees, the Plaintiff incurred subsidized and unsubsidized federally funded student loans as well as private student loan obligations from the Defendants. Stmt. of Undisp. Facts at ¶¶ 27-30; Resp. to Stmt. of Undisp. Facts at ¶¶ 27-30. Specifically, the Plaintiff owes the following:  (1) to ECMC, assignee of Tennessee Student Loan Assistance Corporation and USA Funds, Inc., as of August 29, 2011, Subsidized Federal Family Education Loans in excess of $130,191.00; (2) to Sallie Mae, Inc., as of October 17, 2011, two Signature Student loans in the aggregate amount of $31,860.16 including principal, interest, and late charges; (3) to the University of Tennessee, as of October 17, 2011, a Federal Perkins Loan in the amount of $3,062.50 including principal and interest; and (4) to the United States Department of Education, as of August 29, 2011, five Federal Family Education Loan Program Federal Stafford Loans in the aggregate amount of $82,764.27.  Stmt. of Undisp. Facts at ¶¶ 27-30; Resp. to Stmt. of Undisp. Facts at ¶¶ 27-30; Shipman Aff. at ¶ 3; Vinson Aff. at ¶ 7; Davis Decl. at ¶ 10.

Although he was unsuccessful at his first attempt at taking the Tennessee bar examination in the summer of 2009, the Plaintiff retook and passed the bar examination in February 2010.  Stmt. of Undisp. Facts at ¶ 2; Resp. to Stmt. of Undisp. Facts at ¶ 2.  On April 9, 2010, he was notified by letter that his application had been placed under investigation for character and fitness

concerns stemming from a prior citation for public intoxication and sixteen motor vehicle citations. STMT. OF UNDISP. FACTS at ¶¶ 2, 4; RESP. TO STMT. OF UNDISP. FACTS at ¶¶ 2, 4; DEFS.' COLL. EX. 1 at 31-32, 36. Thereafter, on April 21, 2010, the Plaintiff was arrested by the Knoxville City Police for public intoxication. STMT. OF UNDISP. FACTS at ¶ 5; RESP. TO STMT. OF UNDISP. FACTS at ¶ 5.

The Tennessee Board of Law Examiners (Board of Law Examiners) issued a Show Cause Order on May 18, 2010, directing the Plaintiff "to file a written response and show cause why his application for admission to the Tennessee bar should not be denied on character and fitness grounds." DEFS.' COLL. EX. 1 at 36; STMT. OF UNDISP. FACTS at ¶ 3; RESP. TO STMT. OF UNDISP. FACTS at ¶ 3. When the Plaintiff filed his response to the May 18, 2010 Show Cause Order on June 14, 2010, on the advice of his father and uncle who are both licensed members of the Tennessee bar, he did not disclose the April 21, 2010 arrest; however, the Board of Law Examiners received an anonymous letter on April 26, 2010, advising of the arrest. STMT. OF UNDISP. FACTS at ¶ 6; RESP. TO STMT. OF UNDISP. FACTS at ¶ 6; STMT. OF ADD'L UNDISP. FACTS at ¶ 1; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶ 1; DEFS.' COLL. EX. 1 at 23, 37-38. On June 23, 2010, the Board of Law Examiners issued an order stating that the Plaintiff's response did not overcome the character issues and notified the Plaintiff that it had learned of the arrest, and a show cause hearing was scheduled for July 15, 2010. DEFS.' COLL. EX. 1 at 37. In a responsive letter to the Board of Law Examiners dated June 28, 2010, the Plaintiff advised that he would present full details of the April 21, 2010 public intoxication arrest, and on July 14, 2010, after the Knox County General Sessions Court dismissed the criminal charge against him, the Plaintiff disclosed the April 21, 2010 arrest along with

8

supporting documentation.  STMT. OF ADD'L UNDISP. FACTS at ¶ 2; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶ 2; DEFS.' COLL. EX. 1 at 37-38.

During the Show Cause hearing held on July 15, 2010, the Plaintiff admitted that he was, in fact, intoxicated at the time of his arrest, and he requested and received an adjournment of the hearing so that he could provide additional information to the Board of Law Examiners concerning whether he had an alcohol-abuse problem.  STMT. OF UNDISP. FACTS at ¶ 7; RESP. TO STMT. OF UNDISP. FACTS at ¶ 7; DEFS.' COLL. EX. 1 at 38. The Plaintiff submitted a Second Supplemental Response to the Show Cause Order on August 8, 2010, and a Third Supplemental Response to the Show Cause Order on November 23, 2010.  DEFS.' COLL. EX. 1 at 38-39.  Included within these supplemental responses was information concerning the Plaintiff's meeting in July 2010, with a representative of the Tennessee Lawyers Assistance Program during which an alcohol assessment and evaluation was performed, and his meetings with Dr. James Walker, a psychologist at Vanderbilt Forensic Services.  STMT. OF UNDISP. FACTS at ¶ 13; RESP. TO STMT. OF UNDISP. FACTS at ¶ 13; DEFS.' COLL. EX. 1 at 39.  As a result of these meetings, the Director of the Tennessee Lawyers Assistance Program presented the Plaintiff with two proposed monitoring agreements, both of which were rejected by the Plaintiff who felt it was unnecessary because it had been determined that he did not have a substance abuse or addiction disorder.  STMT. OF UNDISP. FACTS at ¶¶ 14-15; RESP. TO STMT. OF UNDISP. FACTS at ¶¶ 14-15; STMT. OF ADD'L UNDISP. FACTS at ¶¶ 7-8; RESP. TO ADD'L UNDISP. FACTS at ¶¶ 7-8; DEFS.' COLL. EX. 1 at 39.  Another show cause hearing was scheduled for December 2, 2010; however, the Plaintiff did not appear because he had traveled to Tokyo, Japan with his sister at his father's request.  STMT. OF UNDISP. FACTS at ¶ 16; RESP. TO STMT.

OF UNDISP. FACTS at ¶ 16; STMT. OF ADD'L UNDISP. FACTS at ¶ 12; RESP. TO STMT. OF ADD'L

UNDISP. FACTS at ¶ 12; MARLOW AFF. at ¶¶ 4-9.

As stated in the Show Cause Order entered on June 27, 2011, the Board of Law Examiners

subsequently determined that the Debtor should not be licensed to practice law in the State of

Tennessee. STMT. OF UNDISP. FACTS at ¶ 8; RESP. TO STMT. OF UNDISP. FACTS at ¶ 8; DEFS.' COLL.

EX. 1 at 22, 40. Following numerous hearings and appeals by the Debtor, on February 12, 2012, the

Tennessee Supreme Court entered an Order affirming that decision and denying the Debtor's

application for a license to practice law. STMT. OF UNDISP. FACTS at ¶ 8; RESP. TO STMT. OF UNDISP.

FACTS at ¶ 8; DEFS.' COLL. EX. 1 at 36-45. The Plaintiff has not subsequently sought admission to

practice law in any other state, nor does he, by his own admission, have plans to. STMT. OF UNDISP.

FACTS at ¶ 17; RESP. TO STMT. OF UNDISP. FACTS at ¶ 17; DEFS.' COLL. EX. 1 at 9, 156.

From November 2009 through January 2012, the Plaintiff sought employment for a number

of positions, including an adjunct professorship with Pellissippi State Community College in

November 2009; an Administrative Intern position for the County Technical Assistance Service with

the University of Tennessee in November 2009, in January 2011, and again in December 2011; the

Assistant Director of State Relations with the University of Tennessee in December 2009; any

position with Governor Bill Haslam's office or the State of Tennessee in January 2010; a City Court

Assistant with the City of Knoxville in October 2010; an English as Second Language teacher with

the Korean Foreign Language Institute in November 2010; a litigation paralegal with the University

of Tennessee in January 2011; a Municipal Court Administrator with the City of Knoxville in

February 2011 and again in August 2012; the Director of Student Judicial Affairs with the University

of Tennessee in April 2011; an Institutional Compliance Officer with the University of Tennessee in September 2011; a Program Abroad Coordinator with the University of Tennessee in September 2011; an International Student and Scholar Coordinator for the Center for International Education at the University of Tennessee in December 2011; a crime analyst with the City of Knoxville in January 2012; and a licensing associate with the University of Tennessee in January 2012; however, he was not hired for any of those positions. STMT. OF UNDISP. FACTS at ¶ 24; RESP. TO STMT. OF UNDISP. FACTS at ¶ 24; STMT. OF ADD'L UNDISP. FACTS at ¶ 11; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶ 11; DEFS.' COLL. EX. 1 at 70-98, 172-73a; PL.'S COLL. EX. 1 at 1-19, 22-30.  He also applied for various positions with Home Depot, Food City, and Crescent Bend in the spring of 2009, inquired as to work-study at the University of Tennessee in the fall of 2009, sought employment at the Hangout Music Festival and the Bonnaroo Music Festival in February 2012, and posts his resume on a number of online job boards including www.monster.com, www.ladders.com, and www.linkedin.com. STMT. OF ADD'L UNDISP. FACTS at ¶ 11; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶ 11; DEFS.' COLL. EX. 1 at 8, 147-48, 173a-74; PL.'S COLL. EX. 1 at 20-21.

The Plaintiff's resume lists that he held the following seven employment positions between 2002 and the present:  (1) English teacher from February 2002 to March 2003 in South Korea; (2) graduate assistant from August to December 2004 for a Business Ethics professor at the University of Tennessee; (3) work-study office assistant from January to May 2005 and August to December 2005, with the Department of Philosophy at the University of Tennessee; (4) intern for the 104th Tennessee General Assembly from January to May 2006; (5) externship with the Jefferson County District Attorney from August to December 2008; (6) externship with Federal Magistrate

Judge John K. Ott with the United States District Court for the Northern District of Alabama from January to May 2009; and (7) co-founder and managing member of Dogwood Creek Investments, LLC, a real estate development company in Knoxville, Tennessee, from April 2007 to the present. STMT. OF UNDISP. FACTS at ¶ 12; RESP. TO STMT. OF UNDISP. FACTS at ¶ 12; DEFS.' COLL. EX. 1 at 47-48; PL.'S COLL. EX. 1 at 2-3, 15-16, 26-27.  The Plaintiff's resume also evidences that he was commissioned as a notary public in September 2010, and was elected President of the Mechanicsville Neighborhood Watch Association in June 2010. STMT. OF UNDISP. FACTS at ¶ 12; RESP. TO STMT. OF UNDISP. FACTS at ¶ 12; DEFS.' COLL. EX. 1 at 48; PL.'S COLL. EX. 1 at 15, 26. Notwithstanding the foregoing, the Plaintiff has not held steady employment since completing his Juris Doctorate and Master's degrees in May 2009 and 2010, respectively. STMT. OF UNDISP. FACTS at ¶ 20; RESP. TO STMT. OF UNDISP. FACTS at ¶ 20.  The Plaintiff estimates that since September 2010, he has earned $125.00 monthly from Dogwood Creek Investments, LLC. STMT. OF UNDISP. FACTS at ¶ 8; RESP. TO STMT. OF UNDISP. FACTS at ¶ 8; DEFS.' COLL. EX. 1 at 4, 9.  He has also been self-employed, performing construction and landscaping odd jobs, selling beverages outside of Neyland Stadium during University of Tennessee football games during the 2009 and 2010 seasons, and collecting scrap metal and aluminum cans. STMT. OF UNDISP. FACTS at ¶ 22; RESP. TO STMT. OF UNDISP. FACTS at ¶ 22; DEFS.' COLL. EX. 1 at 4-6, 10, 148-150.  The Plaintiff is primarily supported financially by his father, Robert L. Marlow. STMT. OF UNDISP. FACTS at ¶ 23; RESP. TO STMT. OF UNDISP. FACTS at ¶ 23; DEFS.' COLL. EX. 1 at 7, 169.

From January through March 2011, the Plaintiff made three payments, totaling $995.82, to Sallie Mae, Inc., sought a deferment in June 2009, and sought forbearance of his loans in November

2010. Stmt. of Undisp. Facts at ¶¶ 31-32; Resp. to Stmt. of Undisp. Facts at ¶¶ 31-32; Stmt. of Add'l Undisp. Facts at ¶¶ 21-22; Resp. to Stmt. of Add'l Undisp. Facts at ¶¶ 21-22; Defs.' Coll. Ex. 1 at 8-9, 58-61, 154.[6]  Similarly, he sought a forbearance from the University of Tennessee in November 2010 and again in February 2011. Stmt. of Undisp. Facts at ¶¶ 31-32; Resp. to Stmt. of Undisp. Facts at ¶¶ 31-32; Stmt. of Add'l Undisp. Facts at ¶¶ 23-24; Resp. to Stmt. of Add'l Undisp. Facts at ¶¶ 23-24; Defs.' Coll. Ex. 1 at 63-65.  The Plaintiff also transmitted a hardship forbearance or deferment request to EdFinancial in June 2010, concerning the student loans now held by and payable to ECMC.  Stmt. of Add'l Undisp. Facts at ¶ 25; Resp. to Stmt. of Add'l Undisp. Facts at ¶ 25; Pl.'s Coll. Ex. 1 at 33.

The Plaintiff filed the Voluntary Petition commencing his Chapter 7 bankruptcy case on August 29, 2011, and received a discharge on February 2, 2012.  Through his Complaint filed on October 17, 2011, as amended on November 7, 2011, the Plaintiff seeks a determination that, because he has been denied a license to practice law by the State of Tennessee, he is "unemployable," and it would be an undue hardship for him to repay his student loan obligations owed to the Defendants.  In their joint Motion for Summary Judgment, the remaining Defendants, Sallie Mae, Inc., ECMC, the Department of Education, and the University of Tennessee, argue that the Plaintiff does not meet the standards required by § 523(a)(8) and Sixth Circuit case law for undue hardship because the undisputed facts show that:  (1) the Plaintiff can maintain a minimal standard of living; (2) his circumstances are too recent to prove a future inability to make payments while his

---

[6] In his Response to Statement of Undisputed Facts, the Plaintiff states that he made four payments totaling $1,483.11 and cites to the "First Response by Defendant Sallie Mae, Inc."; however, neither that document nor any other document in the record supports the Plaintiff's statement.

present inability to pay is the direct result of freely-made decisions; and (3) he has not made a good

faith attempt to repay his student loans.  In his Response to Motion for Summary Judgment, the

Plaintiff counters that his income is below the federal poverty guidelines promulgated by the

Department of Health and Human Services, that he is making a good faith effort to find employment

utilizing his education but being denied a law license by the State of Tennessee has hindered his

opportunities, and that he has made a good faith effort to repay his loans, all of which together would

satisfy the requirements of proving an undue hardship.

## II

As directed by Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Parties seeking

summary judgment must utilize the following procedures:

(1) *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence*. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

14

(3) *Materials Not Cited*. The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations*. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED. R. CIV. P. 56(c) (made applicable in adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure).[7]  When deciding a motion for summary judgment, the court does not weigh the evidence to determine the truth of the matter asserted but simply determines whether a genuine issue for trial exists, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).

As movants, the Defendants bear the burden of proving that, based upon the record presented to the court, there is no genuine dispute concerning any material fact, that the claims or defenses alleged by the Plaintiff are factually unsupported, and they are entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Owens Corning v. Nat'l Union Fire Ins. Co.*, 257 F.3d 484, 491 (6th Cir. 2001).  The burden then shifts to the Plaintiff, the nonmoving party, to prove that there are genuine disputes of material fact for trial, although he may not rely solely upon allegations or denials contained in the pleadings, as reliance upon a "mere scintilla of evidence in support of the nonmoving party will not be sufficient."  *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006); *see also Matsushita Elec. Indus. Co.,*

---

[7] On December 1, 2010, Rule 56 was substantially amended, and courts were authorized, "insofar as just and practicable," to apply the amendments to all pending motions.  *See* Apr. 28, 2010 Sup. Ct. Order.  As set forth in the Notes of Advisory Committee on 2010 amendments, the standard for granting summary judgment has not changed, and "[t]he amendments will not affect continuing development of the decisional law construing and applying [that standard]."

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)

("When the moving party has carried its burden under Rule 56(c), its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts.").  The court must view

the facts and all resulting inferences in a light most favorable to the non-movant and decide whether

"the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law."  *Anderson*, 106 S. Ct. at 2512.

Nevertheless; "[w]here the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 106 S. Ct. at 1356 (citations

omitted).

Having reviewed the pleadings, the Motion for Summary Judgment, the Plaintiff's Response

to Motion for Summary Judgment, the Statement of Undisputed Facts, the Statement of Additional

Undisputed Facts, and the supporting documentation filed by the parties, the court, for the reasons

set forth below, finds that, even taking the record in a light most favorable to the Plaintiff, there are

no genuine issues of material fact under which Mr. Marlow can establish that it would be an undue

hardship to repay his student loans.  The Defendants Sallie Mae, Inc., ECMC, the Department of

Education, and the University of Tennessee are entitled to summary judgment, and the Complaint

shall be dismissed as to these Defendants.  The student loan obligations owed by the Plaintiff to

Sallie Mae, Inc., ECMC, the Department of Education, and the University of Tennessee are

nondischargeable.

16

# III

Determinations as to the dischargeability of debts are made under the direction of 11 U.S.C.

§ 523(a), which states, in material part, that an individual debtor does not receive a discharge under

11 U.S.C. § 727(a) (2006)[8] of the following debts:

> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for –
>
>> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in party by a governmental unit or nonprofit institution; or
>>
>> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

11 U.S.C. § 523(a)(8).  The Bankruptcy Code does not define undue hardship; however, the Sixth

Circuit and a majority of courts have established the following requirements that must be

demonstrated by a debtor seeking a determination that repayment of student loan debt imposes an

undue hardship:

> "(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans."

---

[8] Chapter 7 debtors receive a discharge of pre-petition debts, "[e]xcept as provided in section 523 of this title," 11 U.S.C. § 727(b) (2006), accomplishing the goal of Chapter 7 to relieve "honest but unfortunate" debtors of debt and allow a "fresh start" through discharge.  *Buckeye Retirement, LLC v. Heil (In re Heil),* 289 B.R. 897, 901 (Bankr. E.D. Tenn. 2003) (citations omitted).

*Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 385 (6th Cir. 2004) (quoting *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987)).  Because student loans enjoy a presumption of nondischargeability, the Plaintiff must establish that repayment will impose an undue hardship by a preponderance of the evidence, and the failure to prove any one factor results in a determination that repayment does not impose an undue hardship.  *Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett)*, 487 F.3d 353, 358 (6th Cir. 2007).

## A

The court is first called upon to assess the Plaintiff's standard of living and determine if he can afford to repay his loans while maintaining a minimal standard of living.  "The essence of the minimal standard of living requirement 'is that a debtor, after providing for his or her basic needs, may not allocate any of his or her financial resources to the detriment of . . . student loan creditor(s).'"  *Wallace v. Educ. Credit Mgmt. Corp. (In re Wallace)*, 443 B.R. 781, 787 (Bankr. S.D. Ohio 2010) (citations omitted).  In order to meet the minimal standard of living factor, a debtor is required to "make some major sacrifices, both personal and financial, with respect to their [sic] current style of living."  *Goodman v. U.S. Dep't of Educ. (In re Goodman)*, 449 B.R. 287, 293 (Bankr. N.D. Ohio 2011) (citations omitted).  Although a debtor earning a modest income and living on an unbalanced budget with no unnecessary or frivolous expenses may be discharged based upon an undue hardship, *Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 438 (6th Cir. 1998), expenditures of items such as internet, cell phones, cable or satellite television, gym or other memberships, and cigarettes "are generally unnecessary to maintain a minimum standard of living and . . . the failure to minimize or eliminate these expenditures [may] not demonstrate a

18

good-faith effort to minimize expenses." *Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515

F.3d 319, 325 (4th Cir. 2008).  As stated by a number of courts,

> [a] minimal standard of living in modern American society includes these elements:
>
>   1.  People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests.  In most climates it also must be heated and cooled.
>
>   2.  People need basic utilities such as electricity, water, and natural gas.  People need to operate electrical lights, to cook, and to refrigerate.  People need water for drinking, bathing, washing, cooking, and sewer.  They need telephones to communicate.
>
>   3.  People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty.  They need the ability to replace them when they are worn.
>
>   4.  People need vehicles to go to work, to go to stores, and to go to doctors.  They must have insurance for and the ability to buy tags for those vehicles.  They must pay for gasoline.  They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.
>
>   5.  People must have health insurance or have the ability to pay for medical and dental expenses when they arise.  People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.
>
>   6.  People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

*Nixon v. Key Educ. Res. (In re Nixon)*, 453 B.R. 311, 326-27 (Bankr. S.D. Ohio 2011) (citations

omitted).  "While a minimal standard of living does not mandate that a debtor live in poverty to

qualify for a discharge of their student-loan obligation, it does mean that the debtor is expected to

do some financial belt-tightening and forego amenities to which he may have become accustomed."

*Campton v. United States Dep't of Educ. (In re Campton)*, 405 B.R. 887, 891 (Bankr. N.D. Ohio

2009).  Additionally, "debtors must demonstrate that they have attempted to maximize their income

by seeking work that would allow repayment of their student loan debts."  *Nixon*, 453 B.R. at 327;

19

*see also Malone v. Higher Educ. Student Assistance (In re Malone)*, 469 B.R. 768, 773 (Bankr. N.D.

Ohio 2012) ("The debtor, however, is expected to use [his] best efforts to maximize [his] income

within [his] vocational profile[.]").

Based upon the record, the court finds that the Plaintiff has sufficiently shown that his current

income and expenses do not allow for the allocation of any additional funds that could be paid to

satisfy his student loan obligations.  In response to an inquiry as to his income for 2011, in his

Amended Response to Sallie Mae, Inc.'s First Request for Production of Documents, the Plaintiff

states that he received a total of twelve monthly payments in the amount of $125.00 from operation

of his real estate development company, Dogwood Creek Investments, LLC, three payments of

$255.00 received from Scott Walker in January, February, and March 2011 on a promissory note

dated January 5, 2011, in the original principal amount of $10,500.00 plus 15% interest,

approximately $5,000.00 gross income by performing landscaping and construction jobs as well as

various odd jobs, a settlement check in the amount of $21.84 from a class action lawsuit against

Briggs and Stratton, and "thousands of dollars from his friends and family as gifts."  DEFS.' COLL.

EX. 1 at 15; *see also* DEFS.' COLL. EX. 1 at 4-6, 9-10, 46.  With respect to 2012, the Plaintiff's

income through May 2012, consisted of the following:  $125.00 monthly received from Dogwood

Creek Investments, LLC, a total of $300.00 received from John "Mike" Elliott for collecting rent,

the gross amount of $1,395.00 for odd and construction jobs, $6.72 from the sale of aluminum,

$25.00 received from his mother, and a $100.00 gift card to Home Depot.  DEFS.' COLL. EX. 1 at

149-50.

As for expenses, the Plaintiff's Amended Response to Sallie Mae, Inc.'s First Set of Interrogatories reflects the following, with the items marked with an asterisk being paid directly by the Plaintiff's father:

    a. Housing
       i. Mortgage (exclusive of property taxes and insurance)  $ 255.00*
       ii. Property Taxes  $ 41.05*
       iii. Home Insurance  $ 49.58
       iv. KUB (water/sewer, natural gas, electric) (average)  $ 108.00*
       v. Plaintiff/Debtor has terminated ADT security at home
    b. Transportation
       i. Automobile Insurance  $ 67.67
       ii. Gasoline/Fuel    (approximately)  $ 150.00
    c. Communication
       i. Cellular Telephone  (approximately)  $ 100.00*
       ii. Plaintiff/Debtor has terminated home telephone service
       iii. Plaintiff/Debtor has not had at-home Internet service in years
       iv. Plaintiff/Debtor has not had cable/satellite TV service in years
    d. Food/Beverage (estimating $15/day)  $ 450.00
    e. Personal hygiene and medical supplies  (approximately)  $ 50.00

DEFS.' COLL. EX. 1 at 11-12. To tighten his budget, the Plaintiff has discontinued his home telephone service, internet, cable, and security services. STMT. OF ADD'L UNDISP. FACTS at ¶ 26; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶ 26. The record further reflects that the Plaintiff's father provides him with a significant amount of financial support, including payment of the Plaintiff's telephone and utilities, the 2011 property taxes on the Plaintiff's residence, and "providing several hundred dollars per month for other expenses." DEFS.' COLL. EX. 1 at 7; *see also* DEFS.' COLL. EX. 1 at 11-12, 169. The Plaintiff's father also funded the Plaintiff's trip to Japan in November 2010. MARLOW AFF. at ¶¶ 6, 12. Finally, the Plaintiff received $400.00 in LIHEP funds from Knoxville Knox County Community Action Committee for payment of his utilities bill in

March 2011.  Stmt. of Add'l Undisp. Facts at ¶ 13; Resp. to Stmt. of Add'l Undisp. Facts at

¶ 13; Defs.' Coll. Ex. 1 at 12, 155.

Unquestionably, the Plaintiff's income is minimal and his expenses are moderate to low even

for an individual without dependents, leaving very little – if any – room for belt-tightening.

Nevertheless, in order to prove that he does not have the ability to maintain a minimal standard of

living, the Plaintiff must also demonstrate that he has attempted to maximize his income, and it is

in this respect that he does not satisfy the first prong of the *Brunner/Oyler* test.

The record reflects that the Plaintiff, who is thirty-one years old, single, and has no

dependents, has earned four degrees – a Bachelor of Arts in Philosophy received in December 2001,

an Associates of Science in Paralegal Studies received in May 2004, a Juris Doctorate received in

May 2009, and a Master of Arts in Social and Political Philosophy received in May 2010.  Although

he passed the Tennessee bar examination in February 2010, for reasons previously set forth in detail,

the Plaintiff did not receive a license to practice law in the State of Tennessee.  From the time he

graduated law school in May 2009 through February 2012, the Plaintiff has applied for professional

positions with Pellissippi State Community College, the University of Tennessee, the State of

Tennessee, the City of Knoxville, and the Korean Foreign Language Institute in addition to seeking

work at Home Depot and Food City in the spring of 2009, and the Hangout Music Festival and the

Bonnaroo Music Festival in early 2012.  From February 2012 to the present, however, the Plaintiff

has not consistently sought employment; instead, he has admittedly performed only "a cursory look

for jobs on several online job boards and found no jobs that match his credentials" while devoting

his time to pursuing lawsuits against the Tennessee Supreme Court and its members, the Board of

Law Examiners and its members, the Tennessee Attorney General, the City of Knoxville, and his

arresting officer. DEFS.' COLL. EX. 1 at 147; *see also* STMT. OF UNDISP. FACTS at ¶¶ 18-19; RESP.

TO STMT. OF UNDISP. FACTS at ¶¶ 18-19; STMT. OF ADD'L UNDISP. FACTS at ¶¶ 3-4; RESP. TO STMT.

OF ADD'L UNDISP. FACTS at ¶¶ 3-4. As stated by the Plaintiff in his Fifth Addendum Response to

Sallie Mae, Inc.'s First Set of Interrogatories, responding to Interrogatories 10, 17, and 19 concerning

whether he is employed and, if not, his efforts to become employed:[9]

> The Debtor/Plaintiff has been diligently working on his various legal proceedings.
> The amount of research and effort required to prepare the various pleadings, briefs,
> etc. has taken all of the Debtor/Plaintiff's time since the previous response. The
> Debtor/Plaintiff did perform a cursory look for jobs on several online job boards and
> found no jobs that match his credentials.

DEFS.' COLL. EX. 1 at 146-47. In further response to Interrogatory 19, the Plaintiff also stated the

following:

> Additionally, the Debtor/Plaintiff solicited a paid position at the Bonnaroo music
> festival from Ms. Lila Honaker, an employee of AC Entertainment and member of
> the Bijou Jubilee Directors, who has hired the Debtor/Plaintiff in the past to work the
> Bonnaroo music festival. This was the second time, the first was by email message
> in February, the current attempt by in-person conversation at the Bijou Jubilee, at
> soliciting a paid job – both attempts resulted in the Debtor/Plaintiff being told that
> all paid positions were filled by persons with more seniority than himself.

---

[9] INTERROGATORY 10: If you are currently unemployed, explain why you are currently unemployed,
including specifically why you were terminated or laid-off from your last job, when you expect to obtain new
employment, and what employment and/or position you expect to obtain.

INTERROGATORY 17: Explain all the reasons why you have not obtained some form of employment for the last
twenty-four (24) months.

INTERROGATORY 19: Describe your efforts, within the last twenty-four (24) months, to obtain any employment at
the highest salary possible, including a description of all positions you have applied for and how you made all such
applications.

DEFS.' COLL. EX. 1 at 148.

D<span>EFS</span>.' C<span>OLL</span>. E<span>X</span>. 1 at 147-48; *see also* D<span>EFS</span>.' C<span>OLL</span>. E<span>X</span>. 1 at 173a; P<span>L</span>.'<span>S</span> C<span>OLL</span>. E<span>X</span>. 1 at 21.  The

Plaintiff also stated, in response to the Department of Education's Interrogatory 10, asking him to

describe his plan, if any, concerning his attempt to obtain a law license in Tennessee, the following:

> The Debtor/Plaintiff is diligently working on a Petition for Writ of Certiorari to the
> United States Supreme Court, due by 14 June 2012, seeking review of the Tennessee
> Supreme Court's decision affirming the Tennessee Board of Law Examiner's
> decision to deny the Debtor/Plaintiff a license to practice law on character and fitness
> grounds.[10]  Additionally, the Debtor/Plaintiff is researching the possibility of filing
> suit against the Tennessee Board of Law Examiners, Tennessee Lawyers Assistance
> Program, the Tennessee Supreme Court and the Tennessee Attorney General's Office
> for a 1983 civil rights action.

D<span>EFS</span>.' C<span>OLL</span>. E<span>X</span>. 1 at 155-56.

The Plaintiff has admittedly not sought admission to the bar in any state besides Tennessee,

stating in his Amended Response to Sallie Mae, Inc.'s First Set of Interrogatories in response to

Interrogatory 13:

> The Plaintiff/Debtor has not sought admission in any other state.  The
> Plaintiff/Debtor would necessarily have to disclose that he had been denied a law
> license from the State of Tennessee on character and fitness grounds as part of the
> application process.  The Plaintiff/Debtor has been advised by numerous attorneys
> in various states that as a result of the Tennessee Board of Law Examiner's denial
> and the pending litigation it is reasonably unlikely that any state would admit the
> Plaintiff/Debtor.

D<span>EFS</span>.' C<span>OLL</span>. E<span>X</span>. 1 at 9.  These sentiments are reiterated in the Plaintiff/Debtor's Response to United

States of America's First Set of Interrogatories Propounded to Debtor/Plaintiff in response to

Interrogatory 10:

> At the present moment the Debtor/Plaintiff does not intend to apply for a law license
> in any other state.  The Debtor/Plaintiff is without the funds necessary to apply to

---

[10] The court takes judicial notice that the Plaintiff's Petition for a Writ of Certiorari was denied by the Supreme
Court on October 1, 2012.

take a bar examination; is without funds to travel to another state to attend the examination; is without funds to afford study materials for another state's laws; and most importantly, is unsure whether any other state would admit the Debtor/Plaintiff in light of the findings of the Tennessee Board of Law Examiners, and the affirmation by the Tennessee Supreme Court, deeming the Debtor/Plaintiff to lack the requisite character and fitness.  All applications to the bar of any state inquires [sic] about previous applications and the Debtor/Plaintiff would be required to disclose, including copies of the numerous pleadings, motions, rulings, etc. Accordingly, it is unlikely that the Debtor/Plaintiff would be eligible for a license in any sister state.

DEFS.' COLL. EX. 1 at 156; *see also* STMT. OF UNDISP. FACTS at ¶ 17; RESP. TO STMT. OF UNDISP.

FACTS at ¶ 17.  Likewise, the Plaintiff has not sought employment outside of Knoxville.  In response

to Interrogatory 18 propounded by Sallie Mae, Inc., inquiring whether he would "be willing to move

to another home town, or State, if by doing so you could earn a higher income[,]" the Plaintiff

answered  that "[i]t is unlikely there are any job prospects for the Plaintiff/Debtor in any location.

Additionally, the Plaintiff/Debtor owns his own residence in Knoxville, Tennessee and is the

managing member of Dogwood, which owns three properties and manages a fourth, in Knoxville,

Tennessee.  The Plaintiff/Debtor would consider any reasonable offer of employment."  DEFS.'

COLL. EX. 1 at 10.  Nonetheless, despite stating that he would "consider any reasonable offer of

employment[,]" the record reflects that the Plaintiff has not pursued any employment even in the

areas surrounding Knoxville that would be within driving distance from his residence.  Additionally,

with respect to the "odd" jobs he performs, when questioned in the Department of Education's First

Set of Interrogatories through Interrogatory 17 as to whether he has advertised his availability to

perform services, the Plaintiff responded as follows:

The Debtor/Plaintiff is without sufficient funds to afford proper advertisement. Additionally, the Debtor/Plaintiff possesses no license of certification and is unable to afford classes, study materials or exam fees to obtain license or certification for any handyman or contractor license.  Moreover, given the decision of the Tennessee

> Supreme Court affirming the Tennessee Board of Law Examiner's decision
> determining the Debtor/Plaintiff has a deficient moral character it is uncertain, and
> improbable, that the Debtor/Plaintiff could obtain any professional licensure.
> The Debtor/Plaintiff advertises, if one is to call it such, through word of mouth. All
> my friends know my dire financial situation and each keep [sic] me in mind when
> they, their family, other friends, or colleagues or neighbors mention needing odd jobs
> performed.

DEFS.' COLL. EX. 1 at 160.

In essence, the record reflects that the Plaintiff has not sought to maximize his income. He

has not pursued any professional positions outside of five specific employers:  one application to

Pellissippi State Community College, ten applications to the University of Tennessee, one informal

application to the State of Tennessee through a congratulatory letter addressed to the newly elected

Governor Haslam, four applications to the City of Knoxville, and one application to the Korean

Foreign Language Institute, and he has not applied for any retail or other positions since doing so to

Home Depot and Food City in the spring of 2009.  The Plaintiff's resume likewise evidences that,

even prior to being denied a law license, his employment history was sporadic, at best, comprised

primarily of part-time or temporary positions and externships.  DEFS.' COLL. EX. 1 at 47-49; PL.'S

COLL. EX. 1 at 2-4, 15-16, 26-27.  In fact, the Plaintiff has been consistently under-employed, and

the majority of his income has come from his father's significant financial assistance.  However,

rather than spending his time seeking employment in other fields or even looking for employment

in other locations, including those within a short driving distance from Knoxville, the Plaintiff has

instead chosen to pursue lawsuits against the Board of Law Examiners and the Tennessee Supreme

Court, challenging "the constitutionality of the Tennessee Supreme Court's decision regarding the

timing and manner of his disclosure of the April 2010 arrest in the United States Supreme Court"

and "the constitutionality of the Tennessee Board of Law Examiners and Tennessee Supreme Court's decision regarding the timing and manner of his disclosure of the April 2010 arrest in the United States District Court for the Middle District of Tennessee."[11]  STMT. OF ADD'L UNDISP. FACTS at ¶¶ 3-4; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶¶ 3-4.  Additionally, the Plaintiff's statement that he "would consider any reasonable offer of employment[,]" DEFS.' COLL. EX. 1 at 10, and his assertion that he is currently seeking employment simply by posting his resume and inspecting online job boards, *see* DEFS.' COLL. EX. 1 at 173a, also support the court's conclusion that the Plaintiff is not actively seeking employment; instead, it appears that the Plaintiff is passively awaiting any employers who might search him out.  Because he has not maximized his income, irrespective of the fact that his current income and expenses do not allow for the payment of his student loan obligations, the Plaintiff has not satisfied the first prong of the *Brunner/Oyler* test.

## B

The court also finds that no reasonable trier of fact could find that the Plaintiff meets the second prong of the *Brunner/Oyler* test which requires the consideration of "additional circumstances" indicating that the Plaintiff's current financial circumstances are beyond his control and are likely to continue into the future.  To satisfy this prong, the Plaintiff must establish that he has done everything within his power to improve his distressed financial state, that the hardship he is experiencing is "undue" and not the "garden variety financial hardship experienced by all debtors who file for bankruptcy relief[,]" and that the circumstances are clearly out of his control.  *Grant v.*

---

[11] *See supra* n.10.

*United States Dept. of Educ. (In re Grant)*, 398 B.R. 205, 212 (Bankr. N.D. Ohio 2008) (citation

omitted).

> Such circumstances must be indicative of a "certainty of hopelessness, not merely a
> present inability to fulfill financial commitment." They may include illness,
> disability, a lack of useable job skills, or the existence of a large number of
> dependents. And, most importantly, they must be beyond the debtor's control, not
> borne of free choice. Choosing a low-paying job cannot merit undue hardship relief.

*Oyler*, 397 F.3d at 386 (citations omitted); *see also Mosko*, 515 F.3d at 325 (holding that it is not an

undue hardship to expect debtors to work second jobs to supplement insufficient income); *Barrett*,

487 F.3d at 359 ("[T]he most important factor in satisfying the second prong is that the 'additional

circumstances' must be 'beyond the debtor's control, not borne of free choice.'") (citation omitted);

*Healey v. Mass. Higher Educ. (In re Healey)*, 161 B.R. 389, 395 (E.D. Mich. 1993) ("A resolute

determination to work in one's field of dreams, no matter how little it pays, cannot be the

fundamental standard from which 'undue hardship' . . . is measured.").

> The center of gravity of the second prong of the *Brunner* test is permanency or, what
> can be termed, an involuntary inability to improve one's financial circumstances.
> Stemming from this principle, this Court has consistently espoused the maxim . . .
> that, (1) a debtor's distressed state of financial affairs must be the result of events
> which are clearly out of their control, and (2) the debtor must have done everything
> within their power to improve their financial situation. Although *sine quo non*, an
> often used explanation, and a common paradigm for an "undue hardship" case, is the
> existence of a permanent disability, whether physical and/or mental.

*Campton*, 405 B.R. at 892 (quoting *Storey v. Nat'l Enter. Sys. (In re Storey)*, 312 B.R. 867, 871-72

(Bankr. N.D. Ohio 2004) (external citations omitted)).

The Plaintiff is 31 years old and it is undisputed that he does not have any medical, physical,

or mental disorders or disabilities, any illnesses, substance abuse addictions, or any medical or

physical limitations that prevent him from obtaining some sort of employment. STMT. OF UNDISP.

28

FACTS at ¶ 25; RESP. TO STMT. OF UNDISP. FACTS at ¶ 25; STMT. OF ADD'L UNDISP. FACTS at ¶ 7;

RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶ 7; DEFS.' COLL. EX. 1 at 15, 18-19. Instead, the

Plaintiff's theory as to the "additional circumstances" which make repayment of his loans "undue"

and beyond his control is summarized in his response to Interrogatory 19 propounded by the

Department of Education asking him to "[d]escribe what employment you are competent to perform

today, and if you believe you are not competent to perform any employment, explain why[,]" to

which he replied:

> Absent a license to practice law the Debtor/Plaintiff is unable to practice law. The
> Debtor/Plaintiff has diligently tried to obtain paralegal employment to no avail.
> Based upon the Debtor/Plaintiff's previous and repeated attempts to seek non-legal
> employment at various levels the Debtor/Plaintiff believes he is unemployable.
> Additionally, the Debtor/Plaintiff now suffers from the stigma of having been
> deemed of possessing a deficient moral character. All other jobs in which the
> Debtor/Plaintiff is competent to perform are of such low income earning ability that
> his student loan debts would constitute an undue hardship.

DEFS.' COLL. EX. 1 at 161. Similarly, as the Plaintiff stated in response to Request for Production

of Document No. 1 made by Sallie Mae, Inc., requesting all documents related to the Plaintiff's

contention that it would be an undue hardship not to discharge his student loans:

> The bulk of the student loan debts, and especially the debts of the Defendant Sallie
> Mae Inc., were for the legal education of the Plaintiff/Debtor. The Plaintiff/Debtor
> has been denied a law license. It is reasonably unlikely that the Plaintiff/Debtor will
> be able to obtain a law license. Absent a law license the Plaintiff/Debtor may not
> engage in the practice of law. Plaintiff/Debtor has sought non-legal employment for
> the past 31 months to no avail. That evidences that the Plaintiff/Debtor is
> unemployable. Possible reasons for is [sic] un-employability include that he is
> deemed to be either over qualified for many jobs or due to the investigation and
> litigation with the Tennessee Board of Law Examiners the Plaintiff/Debtor simply
> is an unattractive applicant.

DEFS.' COLL. EX. 1 at 14.

It can easily be presumed that the Plaintiff is correct in his argument that being denied a law license is a primary factor in his financial situation; however, this fact does not constitute the type of dire circumstances required.  First, the denial of his law license is not the result of events which were not borne of free choice and beyond the Plaintiff's control.  The Board of Law Examiners initially questioned his application because he had disclosed a citation for public intoxication and sixteen motor vehicle citations and later denied the application after learning that the Plaintiff did not disclose an arrest for public intoxication while his application was pending.  STMT. OF UNDISP. FACTS at ¶¶ 2, 4, 6; RESP. TO STMT. OF UNDISP. FACTS at ¶¶ 2, 4, 6; DEFS.' COLL. EX. 1 at 31-32, 36.[12]  These actions – the public intoxication citation, the public intoxication arrest, and the large number of motor vehicle citations – were committed by the Plaintiff.  He made the conscious choice to engage in these actions as well as the decision not to disclose his April 2010 arrest to the Board of Law Examiners, and it is immaterial for the purposes of this adversary proceeding whether the Plaintiff's nondisclosure was based upon the advice of counsel or that he subsequently disclosed the arrest after the charges were dismissed.  See STMT. OF ADD'L UNDISP. FACTS at ¶¶ 1-2; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶¶ 1-2.  It is also immaterial for the purposes of this adversary proceeding why the Board of Law Examiners denied the Plaintiff's application or that the public intoxication charges in September 2006 and in April 2010 were later dismissed.  See STMT. OF ADD'L UNDISP. FACTS at ¶ 28; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶ 28.  Those facts do not

---

[12]  As previously stated, the Plaintiff appealed the decision to the Tennessee Supreme Court, which, after reviewing the record before it, affirmed the decision of the Board of Law Examiners.  STMT. OF UNDISP. FACTS at ¶ 8; RESP. TO STMT. OF UNDISP. FACTS at ¶ 8; DEFS.' COLL. EX. 1 at 35-45.  He has since filed a Petition for a Writ of Certiorari with the United States Supreme Court, alleging due process Fifth Amendment, and Sixth Amendment violations by the Board of Law Examiners and the Tennessee Supreme Court.  STMT. OF ADD'L UNDISP. FACTS at ¶ 3; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶ 3; DEFS.' COLL. EX. 1 at 99-143.  As previously stated, the Plaintiff's Petition for a Writ of Certiorari was denied by the Supreme Court on October 1, 2012.  See supra n.10.

constitute the type of "additional circumstances" necessary to make a finding of undue hardship under the second prong of the *Brunner/Oyler* test.

Second, and more significantly, the Plaintiff has not, as previously discussed, sufficiently sought to maximize his income. The parties have stipulated that, as of August 24, 2012, the national unemployment rate was 8.3%, and the unemployment rate in Tennessee was 8.1%. STMT. OF ADD'L UNDISP. FACTS at ¶¶ 18-19; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶¶ 18-19. Nevertheless, the Plaintiff has admittedly not applied for any specific positions since February 2012, because he has been devoting his energies toward his numerous lawsuits, including this adversary proceeding, and he cannot prove that he is currently unemployable. *See* DEFS.' COLL. EX. 1 at 146-47, 155-56; *see also Nixon*, 453 B.R. at 332 ("Because she has not recently explored opportunities in those areas [for which she is qualified in light of her skill set and considerable capabilities], [the debtor] was unable to produce any evidence that she has been denied any."). The Plaintiff has not sought admission to the bar of any other state based on the fact that he was denied admission in Tennessee, notwithstanding that any future applications would allow the Plaintiff an opportunity to offer a thorough explanation and to produce documents evidencing that both of his public intoxication arrests were subsequently dismissed. *See* STMT. OF ADD'L UNDISP. FACTS at ¶ 28; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶ 28; *see also Nixon*, 453 B.R. at 332 ("It is reasonable to believe that her past may result in some narrowing of her opportunities. . . . Nonetheless, . . . [t]he Court . . . cannot say that her past [plagiarism] will inevitably and ultimately result in a complete restriction, as opposed to a potential narrowing, of job opportunities in her profession."). Additionally, although the parties have correctly stipulated that the Plaintiff does not possess the educational credentials to

become a primary or secondary school teacher in the State of Tennessee, STMT. OF ADD'L UNDISP.
FACTS at ¶ 20; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶ 20, the same cannot be said with
respect to the necessary credentials for teaching at a college level, but he has not pursued that avenue
aside from his one application to Pellissippi State Community College in November 2009.

With respect to the Plaintiff's actual attempts to find a job, the efforts reflected in the record
do not evidence that he has, as he stated in response to Request for Production of Documents No. 2
made by Sallie Mae, Inc. requesting documents relating to his claim that additional circumstances
exist and will persist, "exhausted all reasonable efforts to either obtain a law license and/or to obtain
non-legal employment." DEFS.' COLL. EX. 1 at 14.  In fact, the Plaintiff has not attempted to obtain
a law license in any other state, nor does he intend to.  The Plaintiff has not sought professional
employment within the last two years from any employer other than Pellissippi State Community
College, the University of Tennessee, the State of Tennessee, the City of Knoxville, and the Korean
Foreign Language Institute, nor has he sought any employment outside of the legal or educational
fields.  Likewise, he has not sought any part-time positions with any other type of employer – be it
retail, industrial, food service, or the like – since the spring of 2009, other than selling beverages at
University of Tennessee football games in 2009 and 2010, and inquiring as to positions with two
music festivals in February 2012, nor has the Plaintiff sought employment in any area outside of
Knoxville, including localities within driving distance.  Although the court is not by any means
suggesting that the Plaintiff should give up on his quest to become a licensed attorney or that he
should move to another city to seek employment, the fact remains he has not attempted to maximize
his income, and the majority of his financial difficulties stem from his own personal choices.  In

32

reality, the Plaintiff's circumstances are of his own making, are not out of his control, and have been

exacerbated and prolonged by the Plaintiff's choice to pursue lawsuits against the Board of Law

Examiners, the Tennessee Supreme Court, and the City of Knoxville to the exclusion of seeking

employment.  The existence of the Plaintiff's financial circumstances do not, therefore, evidence an

undue hardship.

## C

Finally, the court finds that the Plaintiff has not made a good faith effort to repay his student

loans and has thus not satisfied the third prong of the *Brunner/Oyler* test.  "This requirement serves

the goal of helping to ensure that a debtor acts responsibly toward their student-loan creditor given

that educational loans are in most cases extended without regards to a debtor's creditworthiness, with

the expectation that the debtor will use their education to obtain remunerative employment so as to

be able to repay the debt."  *Malone*, 469 B.R. at 776.  Under the analysis, "a primary consideration

. . . is axiomatic:  the extent to which any voluntary payments were made toward the student-loan

obligation."  *Roberts v. U.S. Dep't of Educ. (In re Roberts)*, 442 B.R. 116, 120 (Bankr. N.D. Ohio

2010).  Other relevant factors include, but are not limited to:

> (1) whether the failure to repay the student loan was due to circumstances beyond the
> debtor's reasonable control; (2) whether the debtor has used all available resources
> to repay the loan; (3) whether the debtor is using [his] best efforts to maximize [his]
> earnings potential; (4) how long after the loan was incurred did the debtor seek to
> discharge the debts; (5) what the overall percentage of the student loan debt is
> compared to debtor's overall debt; and (6) whether or not the debtor has gained
> tangible benefits [from] the student loan.

*Hart v. Educ. Credit Mgmt. Corp. (In re Hart)*, 438 B.R. 406, 413 (E.D. Mich. 2010).  Under the

*Brunner/Oyle*r test, debtors should explore payment alternatives, but deciding "to forgo the ICRP

is not a per se indication of a lack of good faith[.]"  *Barrett*, 487 F.3d at 364.  Additionally, "[a]ttempts to obtain, and success in obtaining, deferments and forbearances, are highly relevant to the good-faith-efforts-to-pay analysis and can be evidence of good faith even when the debtor has declined to participate in a program[.]"  *Nixon*, 453 B.R. at 334.

The total of all loans to all of the Defendants is $247,877.93.  The Plaintiff does not dispute that each of the loans "is a student loan owed, insured or guaranteed by a government unit[,]" DEFS.' COLL. EX. 1 at 21, and that all of the student loan funds were paid directly to the respective schools, with tuition and fees deducted and the remainder paid to the Plaintiff.  DEFS.' COLL. EX. 1 at 13.  The Plaintiff acknowledges, and the record reflects, that he made three payments totaling $995.82 to Sallie Mae, Inc. but has not made any payments on the other loans.[13]  STMT. OF UNDISP. FACTS at ¶ 31; RESP. TO STMT. OF UNDISP. FACTS at ¶ 31.  The parties stipulated that the Plaintiff requested deferments from Sallie Mae, Inc. in June 2009 and November 2010, requested forbearances from the University of Tennessee in November 2010 and February 2011, and requested either a deferment or forbearance from EdFinancial in June 2010.  STMT. OF UNDISP. FACTS at ¶ 32; RESP. TO STMT. OF UNDISP. FACTS at ¶ 32; STMT. OF ADD'L UNDISP. FACTS at ¶¶ 21-25; RESP. TO STMT. OF ADD'L UNDISP. FACTS at ¶¶ 21-25; DEFS.' COLL. EX. 1 at 8-9, 58-61, 63-65, 154; PL.'S COLL. EX. 1 at 33.  Additionally, it is undisputed that the Plaintiff did not apply for any of the income-based repayment programs available, citing as the reason his lack of income but also stating that were he to secure regular full-time employment, he would apply for an available program.  STMT. OF UNDISP. FACTS at ¶ 32; RESP. TO STMT. OF UNDISP. FACTS at ¶ 32; DEFS.' COLL. EX. 1 at 172.

---

[13] *See supra* n.6.

An examination of the foregoing factors evidences that the Plaintiff has not attempted to repay his loans in good faith.  Clearly, the Plaintiff's failure to make payments on his student loan obligations can be traced to the fact that he has insufficient income to do so.  Nevertheless, the court has already addressed the issue of whether the Plaintiff is maximizing his income, finding that he is not, which weighs against a finding that he has made a good faith effort to repay his loans.  Additionally, although he might argue to the contrary, the Plaintiff has received a tangible benefit from the loans in the form of his four degrees.  Also weighing against the Plaintiff are the timing of and reasons for his bankruptcy filing and the overall percentage of student loan debt compared to his other unsecured debts.  First, the Plaintiff filed his bankruptcy petition on August 24, 2011, just over one year after obtaining his fourth degree – the Master of Arts in Social and Political Philosophy in May 2010 – and just over two years after receiving his law degree from the Cumberland School of Law.  The payments totaling $995.82 were made to Sallie Mae, Inc. in January, February, and March 2011, after which no payments were made to any of the Defendants on any of the loans.  As to why he filed his bankruptcy petition, in his Amended Response to Sallie Mae, Inc.'s First Set of Interrogatories, in response to Interrogatory 24 asking him to explain the reasons he filed for bankruptcy, the Plaintiff expressly stated, in material part, that

> Plaintiff/Debtor filed bankruptcy after prolonged litigation before the Tennessee Board of Law Examiners resulted in a Show Cause Order, entered 27 June 2011, denying the Plaintiff/Debtor a law license.  The Plaintiff/Debtor has been trying, in vein [sic], to obtain employment since graduating law school in May 2009.  It is apparent to the Plaintiff/Debtor that unless he is possessed with a license to practice law he is unemployable.  Having been determined by the Tennessee Board of Law Examiners to lack the proper character and fitness to practice law it is unlikely the Plaintiff/Debtor will be able to obtain a license to practice law.  The decision by the Tennessee Board of Law Examiners is only appealable through a writ of certiorari and it is exceptionally rare to obtain a reversal of an administrative board's ruling.

> These facts coupled with the harassment by multiple creditors, including Defendant
> Sallie [Mae, Inc.], motivated the Plaintiff/Debtor to seek bankruptcy relief.

DEFS.' COLL. EX. 1 at 13; *see also* DEFS.' COLL. EX. 1 at 14 ("The Plaintiff/Debtor attempted in good

faith to avoid bankruptcy for as long as possible, however, after 19 months of litigation aimed at

attempting to obtain a law license the Plaintiff/Debtor had exhausted all reasonable efforts to either

obtain a law license and/or to obtain non-legal employment.").  Second, it is undisputed that the

majority of the Plaintiff's unsecured debt is comprised of his obligations to the Defendants.  In his

bankruptcy schedules, the Plaintiff listed total unsecured debt of $260,453.36, of which he listed

$223,542.00 – or approximately 86% – owed to the Defendants for the Plaintiff's student loans.[14]

STMT. OF UNDISP. FACTS at ¶ 26; RESP. TO STMT. OF UNDISP. FACTS at ¶ 26.  It is also undisputed

that the Plaintiff filed this adversary proceeding on October 17, 2011, less than two months after

filing his bankruptcy case, seeking a determination of undue hardship and discharge of his student

debt obligations.  The fact that the Plaintiff filed his bankruptcy case primarily to file this adversary

proceeding and rid himself of repaying not only his unsecured credit card debt but also his student

loan debt of what currently amounts to more than $247,000.00 while only having paid less than

$1,000.00 total, weighs against a finding that he has attempted to repay his loans in good faith.

## IV

In summary, based upon the evidence presented, in conjunction with its analysis under the

*Brunner/Oyle*r test, the court finds the Plaintiff does not, based upon his current income and

---

[14] The only other unsecured creditors holding claims listed in the Plaintiff's Schedule F – all of which were discharged on February 6, 2012 – were American Express in the amount of $16,675.70, Chase Card Services in the aggregate amount of $8,725.45, and FIA CSNA in the amount of $11,510.31, for a total of $36,911.46.

expenses, maintain a minimal standard of living; however, he has not maximized his income, nor

has he made a good faith effort to repay his student loans to the Defendants.  Additionally, the court

finds that there are no additional or extenuating circumstances which indicate that the Plaintiff's state

of financial affairs is likely to persist for a significant portion of the repayment period such that

repayment of the full amount of his student loan obligations would impose an undue hardship.

Because there is no genuine dispute of material fact that would enable the Plaintiff to meet his

burden of proof with respect to the *Brunner/Oyler* factors and all factors must be satisfied in order

to find an undue hardship, the court finds that it is not an undue hardship to require the Plaintiff to

repay his student loan obligations to the Defendants, that they are nondischargeable debts owed by

the Plaintiff, and that they were not discharged on February 6, 2012.  Furthermore, because it has

been established that repayment would not impose an undue hardship, the court may not exercise its

equitable powers under 11 U.S.C. § 105(a) (2006) to grant a partial hardship discharge.  *Miller v.

Pa. Higher Educ. Assistance Agency (In re Miller)*, 377 F.3d 616, 624 (6th Cir. 2004).


    A Judgment consistent with this Memorandum will be entered.


FILED:  October 10, 2012

                            BY THE COURT

                            */s/  RICHARD STAIR, JR.*

                            RICHARD STAIR, JR.
                            UNITED STATES BANKRUPTCY JUDGE


37